**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

Preston Lewis *individually and as* :
*Executor of the Estate of Phyllis Lewis,* :
*deceased,* :
                       :
           Plaintiff, :     CIVIL ACTION NO.
                       :     1:08-cv-01904-JOF
      v. :
                       :
D. Hays Trucking, Inc., et al., :
                       :
           Defendants.

## OPINION & ORDER

This matter is before the court on Hercules Incorporated's motion for summary judgment [124]; Floyd Dexter Hays and Dexter Hays Forest Products' motion for summary judgment [125]; and Brookwood Insurance Company's motion for summary judgment [126].

## I.     Background

### A.     Procedural History and Facts

Plaintiff, Preston Lewis, individually and as executor of the estate of Phyllis Lewis, filed suit against D. Hays Trucking, Inc.; Floyd Dexter Hays; Hercules, Inc.; and Brookwood Insurance Co. in the State Court of Cobb County on April 29, 2008, alleging causes of action of negligence *per se*, negligence, *respondeat superior*, and punitive damages. Defendants removed the suit to this court on May 30, 2008. The suit arises out

of an accident that occurred on November 11, 2007 when a tractor trailer driven by Floyd Dexter Hays crashed into the car of Phyllis Lewis killing her. The parties engaged in extensive discovery and the matter is now before the court on motions for summary judgment by (1) D. Hays Trucking, Inc. and Floyd Dexter Hays; (2) Hercules, Inc.; and (3) Brookwood Insurance Co.

Accident

On November 11, 2007 at 2:30 p.m., Floyd Dexter Hays left Raven, Alabama, driving a tractor trailer loaded with pine stumps. His destination was the Hercules plant in Brunswick, Georgia. At 6:00 p.m., Hays stopped at a truck stop in Bainbridge, Georgia. There, he drank a cup of coffee and an "energy" drink. He also took Glucovance, his diabetes medication. Hays testified that he could not remember whether he ate anything at the time he took the medication, but he did also state that he generally does not eat when he is on the road.

At 11:45 p.m. that night, Hays was driving east on Georgia route 520, 10 miles west of Brunswick. According to Defendants' accident reconstruction specialist, at the time of the accident, Hays was driving between 74 and 77 m.p.h. in a 65 m.p.h. zone. (Plaintiff's reconstruction specialist opines that Hays' speed was between 81 and 89 m.p.h.). Hays had his low beams on at the time of the accident.

2

There were no skid marks prior to the impact of the tractor trailer with the car owned by Phyllis Lewis. After impact, there are 485 feet of skid marks before the tractor trailer comes to a rest. Hays testified that he did not know what he had struck and did not realize it was another vehicle.

When the tractor trailer loaded with stumps was eventually brought to the Hercules plant, it weighed in at 82,520 pounds. *See* Grozier Depo., at 59.

<u>Hays' Work with Hercules</u>

Hercules is a large chemical corporation. Its operation in Brunswick, Georgia extracts resins from tree stumps and processes the resin into chemical compounds. Hercules then sells these compounds to other manufacturers. In 1999, Hays was recruited by Ray Bryant, a former forester for Hercules, to harvest pine stumps and haul them to the Hercules plant in Brunswick. From 1999 to the present, Hays has delivered harvested stumps only to Hercules. In the aftermath of Hurricane Ivan, Hays did work for one month clearing trees for a company named Gulf Lumber.

Hays uses at least one other worker to clear stumps. Doris Gill operates a bulldozer and "pushes" stumps out. *See* Gill Depo., at 9, 13-14. Gill and Hays load the stumps on to trailers and Hays uses a series of other individuals to drive loads to the Hercules plant in Brunswick so that he and Gill can continue to harvest stumps. In the 6-12 months prior to

3

the accident, Hays had personally driven a truck load to Brunswick only once or twice. *Id.* at 16-18; Hays Depo., at 16-18, 32-34.

Out in the field, Hays and Gill would have contact with foresters from Hercules. *Id.* at 20-21. The relationship between Hays and Gill and the foresters varied. Hays and Gill trusted and respected Ray Bryant and worked with him more closely than others. Bryant would "flag" stumps for Hays and Gill; that is put flags on stumps he thought would be beneficial to harvest. *Id.* at 29-31. Hays and Gill, however, would use their own judgment to determine which stumps to "push." *Id.* at 31. Hays would sometimes reject land a Hercules forester recommended to him because Hays did not believe it would be economically worth his time if there were too few stumps in the area. *Id.* at 45. Gill testified that it was up to Hays whether to harvest the stumps pointed out by the Hercules forester. *Id.* at 47. For example, Gill testified that they rarely followed the recommendations of the current Hercules forester because he did not know "stumps from rocks." *Id.*

In addition to the recommendation of Hercules foresters, Hays would also locate individuals with property that looked to be good for harvesting or individuals knowing his reputation would seek Hays out to clear their stumps. *Id.* at 40. For example, Gill reported that she and Hays had been working on a particular estate for 3-4 years now based on Hays' contacts. *Id.* at 20-21. Gill testified that if any individual requested harvesting or

4

"stumpage" fees, those fees would be paid by Hercules and not Hays. *Id.* at 78. Hays did

not let any Hercules foresters interfere with the manner in which he ran his business. *Id.* at

80.

<u>Contractual Agreements Between Hays and Hercules</u>

Hays and Hercules entered into a Harvesting Contract (relating to extraction of

stumps from the ground) and a Freight Contract (hauling the extracted stumps to the

Hercules Brunswick plant). The Harvesting Contract specified the price Hercules would pay

per ton for the one year term of the contract. *See* Harvesting Contract, Hercules Mot. S.J.,

Exhibit D, at 1. The contract was terminable by either party on thirty (30) days notice. The

Harvesting Contract further states:

> It is understood that the Contractor is an independent contractor and that the
> Contractor will perform all work and furnish all labor, equipment, machinery,
> and do everything necessary for the harvesting and delivery of whatever wood
> the Contractor sells to Hercules. This includes, but is not limited to,
> compliance with the worker's compensation laws and all laws and regulations
> relating to hiring, wages, hours, and taxes as may be applicable to the
> Contractor's operation. Contractor, its employees and agents will in no way
> be regarded, nor shall they act as agents or employees of Hercules.

*Id.* "The Contractor is not required to deliver any specified quantity of wood to Hercules.

. . . The exclusive control of the method and means of harvesting and delivering wood will

be the Contractor's responsibility, and Hercules shall not have and shall not exercise any

supervision or control over the Contractor, its employees, or its agents in the harvesting and

5

delivery of wood." *Id.* The Freight Contract contains similar provisions. *See* Freight Contract, Hercules Mot. S.J., Exhibit E.

These contracts specify that the "contractor shall comply with all laws and regulations applicable to its performance under this contract." Pat Grozier, Hercules' global supply chain manager, testified that Hercules expected its drivers to conform to the applicable law. *See* Grozier Depo., at 32. Hercules does not inspect the equipment used by harvesters and does not require harvesters and haulers to pass drug tests. *Id.* at 33.

Hays did need to repair his equipment from time to time or insure it, and he often did not have the money to do so. He would borrow the money from Hercules which then took a security interest in the equipment for the term of the loan. *See* Gill Depo., at 72. Hays signed a loan agreement with Hercules on February 17, 2007, for $3,063.40. *See* Cox-Frazier Depo., Exh. 3. The agreement provides that Hays transfers the "title to and a security interest in" two bulldozers to Hercules. *Id.* at 1. The agreement also provides that Hays would be in default on the loans if he failed to deliver any stumpwood to Hercules within a 30 day period. *Id.* at 2. The agreement further states that Hays would only use the secured equipment to provide stumpwood to Hercules. *Id.* Hays testified that he believed he could get permission to do other jobs if he asked, but that he had never inquired. *See* Hays Depo., at 189.

6

Another agreement was executed on May 18, 2007 for $19,918.80. *See* Cox-Frazier Depo., Exh. 4. (Hays also signed another loan agreement with Hercules, but that was executed after the accident at issue here.) As security for these loans, Hays was required to put his two bulldozers up as collateral. For a third loan executed on August 14, 2006, in the amount of $5,313.83, Hays also put up his 40-foot Hobbs Trailer as security. *See* Cox-Frazier Depo., Exh. 2. Hays was driving this trailer on the night of the accident. This loan, however, was paid off on March 4, 2007, prior to the accident. *See* Plaintiff's Exhibit C, pages 19-24 (showing loan closed on March 4, 2007, with a final payment of $113.83).

Processing Loads of Stumps at Hercules

Grozier testified that when a truck arrives at the Hercules plant in Brunswick, it is first taken to the truck scales where a "truck ticket" is printed. This ticket shows the lease number of the property where the wood came from, the hauler and harvester, and their identification numbers. *See* Grozier Depo., at 25, 65. The truck ticket also shows the scaled weights. *Id.* at 25-26. The Hercules accounting department uses these "truck tickets" to calculate payment for the load. The harvesters and haulers are paid weekly for the loads they deliver. *Id.* at 26.

Grozier testified that he understood the legal weight limit in Georgia for tractor trailers to be 80,000 pounds. *See* Grozier Depo., at 37. He was aware that loads would "infrequently" come in above that number, but that Hercules does not have any specific

7

policy on what to do if an overweight load comes in. *Id.* Hercules expected its independent contractors to comply with the law. *Id.* at 61. Grozier did not independently monitor the scale weights of the loads that came into the plant. *Id.* at 62.

Ms. Cynthia Cox-Frazier, an accountant with Hercules, would collect the truck tickets each morning and process them through accounting. *Id.* at 66. The harvesters are paid on a per ton basis. *Id.* at 68. Cox-Frazier testified that she would prepare a settlement sheet that would show how much would be paid to the harvester. The truck receipt would be stapled to the settlement sheet and her boss, Robert McGuire, the Hercules controller, would sign off on the payment. *See* Cox-Frazier Depo., at 50-51.

Although Hays did not personally drive but two loads to Brunswick, in the twelve months prior to the collision his drivers had taken 84 loads of stumpwood to Hercules. Only two of those loads were under the 80,000 pound gross vehicle limit in Georgia. *See* O.C.G.A. § 32-6-26. Seventeen of the loads exceeded 90,000 pounds.

## B.    Contentions

D. Hays Trucking, Inc. and Floyd Dexter Hays argue that Plaintiff has not proffered any evidence but rather only speculation that Hays' type II diabetes contributed to the accident. They further contend that Plaintiff has not submitted any evidence that Phyllis Lewis experienced conscious pain and suffering in the moments before the accident. D. Hays Trucking, Inc. and Floyd Dexter Hays also assert that there is no evidence of a

conspiracy between them and Hercules, Inc., nor are there any facts to support an award of punitive damages and expenses of litigation.

Plaintiff responds that Hays' own doctor testified that one month before the accident, he refused to clear Hays for driving and would not sign a Department of Transportation medical clearance form based on Hays' high levels of blood sugar. Hays' doctor further testified that symptoms of high blood sugar include fatigue and blurred vision. Plaintiff also avers that on a dark clear night, the decedent would have seen the headlights of Hays' tractor trailer bearing down on her and would have known that the tractor trailer was not stopping, but rather was going to crash into her. Finally, Plaintiff states that because Hays knew that his doctor had not medically cleared him to drive because of his diabetic condition, Plaintiff is entitled to punitive damages and expenses of litigation.

Hercules, Inc. argues that Plaintiff's claims against it cannot succeed because Floyd Dexter Hays was an independent contractor and not an employee of Hercules and that Hercules did not own the tractor trailer driven by Hays at the time of the accident. Hercules further asserts that there is no evidence of a conspiracy among the Defendants and no facts to support an award of punitive damages or the expenses of litigation.

Plaintiff responds that Hercules controlled the time, manner, and place of Hays' work and therefore Hays was not an independent contractor but rather an employee of Hercules. Plaintiff further argues that he has provided sufficient evidence for a jury to consider a

9

charge of conspiracy because Hercules knew that Hays' trucks were delivering overweight loads and tacitly approved that practice by paying Hays for the loads that he brought regardless of whether they were overweight.

Brookwood Insurance Co. moves for summary judgment contending that no judgment has yet been entered against Brookwood's insured (the tractor trailer involved in the accident) and therefore suit against the insurer is premature. Brookwood further avers that Georgia's "direct action statute" does not apply because Brookwood's insurance policy was not on file in Georgia and because Brookwood's insured was not a "motor common carrier" as defined by O.C.G.A. § 46-1-1.

Plaintiff responds that Georgia's "direct action statute" does apply because Brookwood's failure to file its policy (despite being required to because Hays was an interstate carrier) does not result in the reward to Brookwood of avoiding a direct action suit. Further, Plaintiff states that the tractor trailer does not qualify for an exemption from the definition of "motor common carrier" because it was operating interstate, it was not transporting goods between the field and the mill, and Hercules took title to the stumps when they were pulled from the field.

AO 72A
(Rev.8/82)

## II.    Discussion

### A.    Independent Contractor

A threshold issue in this case is to determine whether Hays is an independent contractor or an employee of Hercules.  Under Georgia law the

> employer generally is not responsible for torts committed by his employee when the latter exercises an independent business, and it is not subject to the immediate direction and control of the employer. In determining whether the relationship of parties under a contract for performance of labor is that of employer and servant or that of employer and independent contractor, the chief test lies in whether the contract gives, or the employer assumes, the right to control the time, manner, and method of executing the work as distinguished from the right merely to require certain definite results in conformity to the contract. Where the contract of employment clearly denominates the other party as an independent contractor, that relationship is presumed to be true unless the evidence shows that the employer assumed such control. On the other hand, where the contract specifies that the employee's status shall be that of independent contractor but at the same time provides that he shall be subject to any rules or policies of the employer which may be adopted in the future, no such presumption arises.

*Cotton States Mutual Ins. Co. v. Kinzalow*, 280 Ga. App. 397, 399-400 (2006) (quoting *Ross v. Ninety-Two West*, 201 Ga. App. 887, 891-92 (1991)); *see also Golosh v. Cherokee Cab. Co.*, 226 Ga. 636, 637 (1970).

The court notes that throughout his discussion of whether Hays was an independent contractor, Plaintiff refers to ten different factors for the court to consider.  *See* Response to Hercules's Mot. S.J., at 11-15 (citing *Moss v. Central of Georgia R. Co.*, 135 Ga. App. 904, 906 (1975)).  *Moss*, however, was not decided under Georgia state law; rather, that case

11

arose under the Federal Employer's Liability Act which applies federal common law. *Id.* at 905 ("the problem of whether an FELA plaintiff is an independent contractor or an employee is a problem of federal law" and court specifically "refrain[ed] from a comparison of Georgia cases on this question"). Georgia law does not apply these ten factors and Plaintiff's citation to them does not point to any particular conclusion under Georgia law.

Here, the terms of the Harvesting Contract and Freight Contract between Hays and Hercules clearly denominate Hays as an independent contractor. Nothing about those contracts purports to subject Hays to any rules or policies of Hercules. Thus, the presumption arises that Hays is an independent contractor. Plaintiff, however, points to the loan agreements Hays made with Hercules as evidence that Hercules controlled the time, manner, and method of Hays' work because those agreements gave Hercules "title to and a security interest in" all of Hays' equipment, required him to get permission before working for anyone but Hercules, and required Hays to harvest and haul a load of stumps to Hercules at least once every 30 calendar days.

The court finds that Ms. Gill's testimony is undisputed as to what happened on a day-to-day basis with Hays' business. Ms. Gill was quite clear that while foresters from Hercules would come out to provide guidance and recommendations to Hays, he never believed he was obligated to follow their recommendations and, in fact, would refuse to follow them if he felt it was not in his economic interest. Ms. Gill also testified that she and

12

Hays would make their own decisions about which stumps to "push" despite the "flagging" of certain stumps by the Hercules foresters. Ms. Gill also stated that Hays would sometimes locate stumping tracts on his own based on his own contacts within the community.

The fact that under the terms of the security agreements, Hays was required to produce a load of stumpwood at least every thirty days or that Hercules had taken a security interest in Hays' equipment that meant Hays could not use those bulldozers to "push" stumps for anyone other than Hercules does not render the relationship one of employer-employee as opposed to independent contractor. In fact, Georgia specifies that the "existence of a security interest, agricultural lien, or authority given to a debtor to dispose of or use collateral, without more, does not subject a secured party to liability in contract or tort for the debtor's acts or omissions." O.C.G.A. § 11-9-402. *See McLaine v. McLeod*, 291 Ga. App. 335, 340-41 (2008) (where company "merely retained right to require results in conformity with the contract" and individuals "retained the right to perform the work by their own means, method and manner" no employer/employee relationship); *Jacobs v. Thomson Oak Flooring*, 250 Ga. App. 56, 58-59 (2001) (no employer/employee relationship existed as matter of law despite the fact that defendant designated which tracts the contractor was to cut, told him where to haul it, and periodically visited work site to enure cutting was being done properly); *Ross v. Ninety-Two West*, 201 Ga. App. 887, 891-92 (1991) (no employer/employee relationship even though realty company provided individual with

13

office, telephone and secretary, expected agent to attend regular sales meetings and provided agent business cards with company's inscription); *Yow v. Federal Paper Board Co.*, 216 Ga. App. 652 (1995) (where timber company inspects operations to ensure right timber is being cut and company directed where loads of timber were to be unloaded at plant, plaintiff cannot show necessary degree of control to hold driver is employee and not independent contractor); *Slater v. Canal Wood Corp.*, 178 Ga. App. 877 (1986) (no employer/employee relationship where company retained right to inspect tract where cutting occurred, required driver to carry certain types of insurance and comply with applicable state and federal laws, reserved right to make suggestions and recommendations concerning the work, and required work to be done according to industry standards). *Cf. Davis v. Beasley Timber Co.*, 241 Ga. App. 706, 708 (1999) (court held issue of fact on whether driver was independent contractor because company owned truck, told driver when to report for work and when to pick up a load of lumber, and provided instructions on company policies and company "do's and don'ts"); *Ledbetter v. Delight Wholesale Co.*, 191 Ga. App. 64 (1989) (question of fact remained where ice cream company restricted hours of sale by having product available for pick during limited times and requiring drivers to return vending trucks by certain time each day; company would terminate drivers if it received customer complaints and determined driver did not follow "suggestions" on how to conduct business from vending truck).

14

In the end, it is Hays who determined the time, manner, and method of his work. It was Hays who decided whether he would work a particular tract to "push" the stumps and Hays who hired Ms. Gill and other individuals to haul the harvested stumps to Hercules. Plaintiff has not adduced any evidence to rebut the presumption that arises out of the Harvester and Freight Contracts Hays signed with Hercules and therefore no reasonable jury could determine that Hays is an employee and not an independent contractor. The court GRANTS Hercules's motion for summary judgment on the issue of independent contractor.

In the alternative of arguing that Hays is an employee/agent of Hercules, Plaintiff also asserts that Hercules would be liable for Hays' negligence because Hercules has a non-delegable duty to ensure that equipment it owned is safely operated on the roads of Georgia. *See* O.C.G.A. § 51-2-5 (an "employer in Georgia is liable for the negligence of a contractor if the wrongful act is the violation of a duty imposed by statute"); *Watkins v. First South Utility*, 284 Ga. App. 547, 549 (2007). Plaintiff argues this statute applies by virtue of the security agreements in the loan documents and Plaintiff's assertion that Hercules owned the Hobbs trailer and the 82,500 load of stumps on the trailer.

As an initial matter, the court notes that it is undisputed that Hays had paid off the loan related to the tractor trailer involved in the accident. *See* Plaintiff's Exhibit C, pages 19-24 (showing loan closed on March 4, 2007, with a final payment of $113.83). Thus, there is no evidence that Hercules "owned" the tractor trailer involved in the accident.

AO 72A
(Rev.8/82)

Moreover, the court finds that the language in the Security Agreements that conveys "title to and security interest in" the equipment does not convey an ownership interest in the equipment, but rather only a security interest. *See Spurlock v. Commercial Banking Co.*, 138 Ga. App. 892 (1976) ("A security instrument cannot purport to convey both a lien and title: it cannot simultaneously retain and not retain title.").

Finally, it is not clear to the court that Plaintiff has submitted any evidence from which a fact-finder could conclude that Hercules owned the stumps on Hays' trailer. The only evidence Plaintiff points to in support of this assertion is the fact that Hercules negotiated contracts with landowners under which Hercules would be permitted to extract stumps from those properties. *See* Response (Hercules Mot. S.J.), at 16. While the evidence does show that Hercules would gain permission from landowners to enter the property and would at times pay "stumpage fees" to landowners, there is no evidence about the ownership of the actual stumps or the particular circumstances of the stumps that were on Hays' trailer the night of the accident, other than they came from a tract of land owned by Kent Sherrill.

For these reasons, the court GRANTS Defendants' motion for summary judgment as to the issue of independent contractor and *respondeat superior*.

16

**B.    Conspiracy**

Plaintiff's complaint makes the following allegations with respect to conspiracy: "Defendants entered into an agreement to engage in unlawful and/or tortious conduct, to wit: transporting loads of stump wood across the public roads of Georgia that exceed the lawful limit." Plaintiff further alleges that "Defendants did in fact transport a load of stump wood on the day of the incident that exceeded the lawful weight limit and as the proximate result of their actions, Plaintiff suffered damages." *See* Amended Cmplt., ¶¶ 44-45.

The parties appear to understand that Georgia does not recognize an independent tort of "conspiracy." Rather, Georgia law describes a conspiracy as:

> a combination between two or more persons either to do some act which is a tort, or else to do some lawful act by methods which constitute a tort. Where it is sought to impose civil liability, the conspiracy of itself furnishes no cause of action. The gist of the action, if a cause of action exists, is not the conspiracy alleged, but the tort committed against the plaintiff and the resulting damage. . . .
>
> While the conspiracy is not the gravamen of the charge, it may be pleaded and proved as aggravating the wrong of which the plaintiff complains, enabling him to recover in one action against all defendants as joint tortfeasors. . . .
>
> If no cause of action is otherwise alleged, the addition of allegations concerning conspiracy will not make one; but, where a cause of action is alleged, the fact of conspiracy, if proved, makes any actionable deed by one of the conspirators chargeable to all. . . . The liability is joint and several.

17

*Cook v. Robinson*, 216 Ga. 328, 328-29 (1960) (quotations and citations omitted). *See also Mills v. Moseley*, 50 Ga. App. 536, 538 (1935).

Under these circumstances, Plaintiff's allegation of conspiracy appears to be an alternative method of establishing liability against Hercules. Plaintiff first alleged that Hays was not an independent contractor, but rather an employee of Hercules. Second, Plaintiff contended that Hercules owned the trailer and the stumps and therefore had a non-delegable statutory duty. The court has rejected both of these theories. Now, Plaintiff alleges conspiracy as a third alternative theory of establishing tort liability against Hercules.

In support for his conspiracy claim, Plaintiff alleges that Hercules and Hays had a "tacit agreement" to violate Georgia law by carrying overweight loads to Hercules's Brunswick facility. There is no dispute that Hays loaded and had delivered to Hercules truck loads that were consistently over the Georgia legal limit. Plaintiff's evidence as to Hercules's role in this process is less definitive. It is true that Hercules paid Hays by weight and that the truck ticket showed the weight of the load. It is less clear that anyone at Hercules with authority understood that Hays' weights were consistently over the legal limit. An accountant would review the truck ticket to calculate the payment to Hays. The company's controller would provide the second signature on the check, but there is no evidence that the controller reviewed the actual truck ticket itself as part of this process and therefore would have seen the weights.

Even assuming that individuals with authority at Hercules were aware of the weight issue, however, the real difficulty with Plaintiff's conspiracy theory is that there is no evidence that the instant accident was caused by the overweight load of the truck. Plaintiff alleges that the tort committed against Ms. Lewis was Hays' negligent operation of the tractor trailer by (1) speeding, (2) driving only on low beams, (3) driving with an overweight load, and (4) driving a tractor trailer when he was not medically qualified to operate. The only one of these four factors that could relate to Hercules and therefore could form the basis of a "tacit understanding" between Hercules and Hays is the weight issue. Undisputedly, Hercules had no information as to Hays' speeding, driving with low beams, or his medical condition. Therefore, Hercules could not have formed a tacit understanding as to any of those factors.

To address this causation problem, Plaintiff argues that Defendants have pointed to nothing in the record to show that weight did not affect the accident. Plaintiff also contends that his accident expert, John Bethea, testified that the "force" of the impact from the overweight tractor trailer would have been greater than if the trailer had been within legal limits. *See* Bethea Depo., at 168-70 ("My opinion is severity of impact with a vehicle was more severe based on a higher weight."). Mr. Bethea did not offer an opinion on how much more severe the impact was because of the 82,500 pound weight of the tractor trailer. *Id.* at 168. He opined only that the force of impact would be greater at 82,500 than it would be

19

at 80,000. *Id.* at 169-70. This testimony, however, says nothing about causation. Plaintiff has proffered no evidence that the accident, itself, would not have happened had the weight not been over limits, particularly where the weight was only 2,500 pounds over. Thus, with respect to the only link Plaintiff can assert between Hercules and Hays – the weight of the tractor trailer loads coming into the Hercules plant – Plaintiff has no causation evidence.

It is, of course, Plaintiff's burden to establish conspiracy and a defendant may be entitled to summary judgment where a plaintiff cannot demonstrate any evidence on an element of a cause of action. Here, the court has determined that Plaintiff has proffered no evidence on causation as to Hercules's alleged "tacit understanding" with Hays concerning transport of overweight shipments of stumps. Because Plaintiff cannot establish this element of causation, Plaintiff's allegation of conspiracy fails and the court GRANTS Defendants' motion for summary judgment on conspiracy.

### C. Punitive Damages

Plaintiff argues that the jury is entitled to consider the issue of punitive damages because Hays drove the tractor trailer despite knowing that his physician refused to sign the Department of Transportation medical authorization clearance, and further drove an overweight load at speeds in excess of the legal limit. Plaintiff contends that Hercules should be liable for punitive damages because it sanctioned Hays' transportation of overweight loads and because Hays is Hercules's employee. Because the court has

20

determined above that Hays is not an employee of Hercules, the court finds there is no basis

to hold Hercules liable for punitive damages and the court only discusses such damages with

respect to Hays. Georgia law provides:

> Punitive damages may be awarded only in such tort actions in which it is
> proven by clear and convincing evidence that the defendant's actions showed
> willful misconduct, malice, fraud, wantonness, oppression, or that entire want
> of care which would raise the presumption of conscious indifference to
> consequences.

O.C.G.A. § 51-12-5.1(b). "Negligence, even gross negligence, is inadequate to support a

punitive damage award." *See Colonial Pipeline Co. v. Brown*, 258 Ga. 115, 118 (1988). In

automobile accidents, "punitive damages are not recoverable where the driver at fault simply

violated a rule of the road." *See, e.g., Carter v. Spells*, 229 Ga. App. 441, 442 (1997).

Punitive damages, however, are available "where the collision resulted from a pattern or

policy of dangerous driving." *Id.*

As one would expect, cases analyzing punitive damages run the continuum. In *Coker

v. Culter*, 208 Ga. App. 651 (1993), the plaintiff sought punitive damages against a driver

in an automobile accident where it was undisputed that the driver had been speeding, there

was standing water on the road and visibility was poor, drug paraphernalia was found in the

back of the driver's car, and the driver's blood alcohol level one hour after the accident was

0.03 percent. *Id.* at 651-52. The court rejected the plaintiff's claims for punitive damages,

however, holding that even though there might be evidence of gross negligence, there was

not sufficient evidence to meet the level required for punitive damages. *See also Bradford v. Xerox Corporation*, 216 Ga. App. 83 (1995) (affirming grant of summary judgment on punitive damages with respect to driver's actions where evidence showed driver was speeding while reporting to his job, road was wet, and he crossed highway median and struck plaintiff's vehicle).

In contrast, in *J.B. Hunt Transport, Inc. v. Bentley*, 207 Ga. App. 250 (1993), the court found a jury was authorized to award punitive damages. There, the procedural posture of the case was before the court of appeals after a jury verdict rendered punitive damages against both the truck driver and the trucking company. Furthermore, the facts in *Hunt* are far more extreme than those presented in the instant case. In *Hunt*, the evidence showed that the truck had been taken in for maintenance shortly before the accident; several witnesses testified that the truck was driving very erratically and swinging from lane to lane for at least ten to twenty miles before the accident yet the driver did not take it out of service; a Georgia Public Service Commission inspection found one-third of the logbook violations related to excessive hours driving; Hunt destroyed the driver's log book, as well as pre-trip and post-trip inspection reports on the vehicle after it had initiated its own investigation; and Hunt failed to produce the driver as a witness.

Similarly, in *Glenn McClendon Trucking Co. v. Williams*, 183 Ga. App. 508 (1987), on review after a jury verdict, the trucking company ordered mechanics to make repairs on

the trucks without giving them the appropriate tools to perform the task. Further, while the truck was on the road, its wheels began to smoke. This activity was observed by another driver who radioed the truck's driver. The truck's driver ignored the advice of the other driver to stop and continued on the route. The truck's driver did not stop until he was told that his brake drum was falling on his brake line. Before the driver could stop, however, the wheels separated from the truck and the wheels crashed into another car, injuring a passenger. Under these circumstances, the court found the jury was authorized to consider punitive damages.

The court finds the distinction drawn by the court in *Carter v. Spells* to be useful. There, the court stated that:

> punitive damages are not recoverable where the driver at fault simply violated a rule of the road. *See*, *e.g.*, *Bradford v. Xerox Corp.*, 216 Ga. App. 83 (1994) (defendant's speeding did not warrant imposition of punitive damages absent evidence of other aggravating circumstances); *Coker v. Culter*, 208 Ga. App. 651 (1993) (punitive damages not warranted even though defendant was speeding on wet roads, had consumed some alcohol, and behaved abominably after collision); *Cullen v. Novak*, 201 Ga. App. 459 (1991) (careless running of red light not sufficient aggravating circumstance).

> On the other hand, punitive damages are recoverable under the statute where the collision resulted from a pattern or policy of dangerous driving. *See*, *e.g.*, *Boyett v. Webster*, 224 Ga. App. 843 (1996) (DUI in incident and on previous occasions); *Cheevers v. Clark*, 214 Ga. App. 866 (1994) (drunk driving in incident at issue as well as subsequent arrests for drunk driving); *Holt v. Grinnell*, 212 Ga. App. 520 (1994) (drunk driving); *Smith v. Tommy Roberts Trucking Co.*, 209 Ga. App. 826 (1993) (a "policy" of excessive speed plus defendant struck plaintiff's vehicle twice and kept pushing); *J.B. Hunt Transport v. Bentley*, 207 Ga. App. 250 (1992) (truck driver drove 20

23

miles despite serious mechanical problem which caused collision); *Viau v. Fred Dean, Inc.*, 203 Ga. App. 801 (1992) (drunken driving); *Day v. Burnett*, 199 Ga. App. 494 (1991) (driving under the influence and in violation of a number of traffic safety laws).

*Id.* at 442.

The court finds the situation here closer to *Coker* than *Hunt* and *McClendon*. Like the driver who was speeding on wet roads and had consumed alcohol before the crash, here, the evidence Plaintiff has adduced against Hays is that he drove at excessive speeds, carried a slightly overweight load, and drove despite knowing that his blood sugar situation was not being properly controlled. The court finds these facts do not form the basis of a pattern and policy of dangerous driving and are more akin to violating rules of the road.

Therefore, the court GRANTS Defendants' motion for summary judgment as to punitive damages.

### D.    O.C.G.A. § 13-6-11

Plaintiff argues that Hays' behavior warrants attorney's fees under § 13-6-11 because he drove his tractor trailer despite being told by his physician that he did not pass the Department of Transportation physical. O.C.G.A. § 13-6-11 provides the "expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefore and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them." *Id.* Plaintiff does not appear to seek any attorney's fees

24

based on resistance of the claim after the cause of action had arisen. Therefore, the basis for Plaintiff's claim must be under the "bad faith" prong of § 13-6-11.

"Bad faith" is "bad faith connected with the transaction and dealings out of which the cause of action arose, rather than bad faith in defending or resisting the claim after the cause of action has already arisen." *Monterrey Mexican Restaurant of Wise, Inc. v. Leon*, 282 Ga. App. 439, 451 (2006) (internal quotations omitted). Bad faith requires more than "bad judgment" or "negligence," rather the statute imports a "dishonest purpose" or some "moral obliquity" and implies "conscious doing of wrong" and a "breach of known duty through some motive of interest or ill will." *Powell Company v. McGarey Group, LLC*, 508 F. Supp. 2d 1202, 1219-20 (N.D. Ga. 2007 (Carnes, J.) (quoting *Vickers v. Motte*, 109 Ga. App. 615, 619-20 (1964)).

There are few, if any, cases applying Georgia law which discuss the issue of "bad faith" with respect to an underlying motor vehicle accident. Rather, the cases instead focus on post-accident behavior. In *Knobeloch v. Mustascio*, 640 F. Supp. 124 (N.D. Ga. 1986) (Shoob, J.), the court did find that a jury would be authorized to award attorney's fees in a vehicular accident where the driver had a blood alcohol content of .23% at the time of the accident. That case, however, relied upon Georgia cases which allowed the award of punitive damages in cases of serial instances of drunk driving on the theory that such incidents reflected willful conduct under the punitive damages statute.

25

Similarly, in *Ford Motor Co. v. Stubblefield*, 171 Ga. App. 331 (1984), the court found the jury was authorized to award attorney's fees on the basis of bad faith where the evidence showed that prior to sale, Ford had actual knowledge of a defect in its product from which it could have reasonably foreseen injury of the type sustained in the accident, yet Ford did not stop the sale of the vehicle. Ford documents showed that if certain cars were struck from behind, they would burn with the possibility of injury to occupants. Evidence also showed that Ford considered the cost of correction and deliberately decided to market the car without correction to save money. "Thus," the court found "we note that the same evidence which authorized the verdict for punitive damages – that Ford had actual knowledge before the sale of the automobile of a condition presenting a danger to users – also authorized the jury to find that Ford acted in bad faith in placing such a vehicle in the channels of commerce." *Id.* at 342.

The court finds a jury could conclude, based in particular on the evidence that Dr. Holbrook told Hays that he would not certify him, that Plaintiff would be entitled to attorney's fees under O.C.G.A. § 13-6-11. Therefore, the court DENIES Defendants' motion for summary judgment on this claim.

### E.    Conscious Pain and Suffering

Defendants move for summary judgment on Plaintiff's claim for conscious pain and suffering arguing that Plaintiff has submitted no evidence to show that Phyllis Lewis

experienced conscious pain and suffering in the accident. Plaintiff responds that it was a clear, dark night and the accident happened on a straight stretch of road. Therefore, Ms. Lewis would have been aware of the headlights of the tractor trailer bearing down on her and would have known that the tractor trailer was not stopping.

Georgia recognizes an award of damages for pain and suffering of a decedent. However, where "the medical evidence is that death was instantaneous, and there is no evidence the decedent exhibited consciousness of pain, recovery for the decedent's pain and suffering is not permitted." *Grant v. Georgia Pacific Corp.*, 239 Ga. App. 748, 750-51 (1999). The fact of instantaneous death, however, does not always preclude damages for pain and suffering. In *Monk v. Dial*, 212 Ga. App. 362 (1994), the court held that a jury was authorized to award damages for the decedent's pain and suffering despite the fact that death was instantaneous and there was no movement or sign of life after the accident. Significantly, however, the plaintiff had submitted evidence that shortly before the accident, the decedent's vehicle veered sharply. From this, the "jury could infer that the decedent was aware of the impending crash, and from these circumstances could extrapolate the probable mental state of the decedent in that last moment of consciousness. The fright, shock, and mental suffering experienced by an individual due to the wrongful acts of negligence will authorize a recovery where attended with physical injury." *Id.* at 362.

27

In *Department of Transportation v. Dupree*, 256 Ga. App. 668 (2002), the decedent's family filed suit against the Department of Transportation after the decedent attempted to cross the street at a busy intersection after dark. The motorist never saw the pedestrian before striking her. The decedent's family contended that negligent traffic planning at the intersection by the Department of Transportation led to the accident. The Department of Transportation moved to dismiss the plaintiffs' claim for conscious pain and suffering of the decedent. The court noted that "[f]or pre-impact pain and suffering to be awarded, the jury must have some evidence that the deceased at some point in time was conscious of her imminent death; the jury may infer such consciousness from evidence immediately prior to impact or following her injury." *Id.* at 680. The court then held that:

> While the driver of the car that struck Mrs. Lamb did not see her, this does not give rise to the inference that Mrs. Lamb did not both see and hear the van and the car as they bore down upon her at 45 mph when she was only part of a lane from the safety of the west curb. The headlights would have been visible to Mrs. Lamb at least 150 feet away from her. Mrs. Lamb would have been able to see the approaching headlights rounding the curve over 350 feet away and up to 14 seconds away. Since it would take the van approximately 120 to 180 feet to change lanes, then Mrs. Lamb would have had several seconds to realize her deadly peril as the headlights of the following car loomed behind the swerving van. Thus, Mrs. Lamb would have gone from relief at seeing the van swerve away from her to horror at seeing the car's lights looming at her in her lane. Thus, denial of the motion was proper.

*Id. See also Mascarenas v. Cooper Tire & Rubber Co.*, 643 F. Supp. 2d 1343 (S.D. Ga. 2009) (Alaimo, J.) (where decedent was killed in rollover crash allegedly caused by defective tire, jury question as to whether decedent experienced pain and suffering during

AO 72A
(Rev.8/82)

and after accident because plaintiff proffered evidence that decedent was aware of impending accident).

Here, there seems to be no dispute that Ms. Lewis's death was instantaneous. Testimony from first responders shows that there were no signs of life when they arrived on the scene. There is no evidence of any action Ms. Lewis may have taken after the accident which would indicate her survival for any period of time. As explained above, however, these facts themselves do not foreclose Plaintiff's argument. *Dupree* shows that a jury may infer from circumstances that a decedent was aware of impending "deadly peril."

Defendants argue that *Dupree* is distinguishable because there the decedent was a pedestrian and she had seen one car swerve to avoid her which might have put her in apprehension of another approaching vehicle. The court is not persuaded. Georgia cases authorize the jury to infer fright and apprehension from circumstances. The fact that Ms. Lewis was apparently in her vehicle at the time of the accident does not preclude a jury's finding of fright where it is undisputed that the dark night was clear, the stretch of road was straight, and Hays had his low beams on. A jury could infer from these circumstances that Ms. Lewis understood the tractor trailer was bearing down on her and was not going to stop. For this reason, the court DENIES Defendants' motion for summary judgment on pre-impact pain and suffering.

AO 72A
(Rev.8/82)

### F.    Hays' Medical Condition

Causation is an element of the negligence claim that Plaintiff ultimately bears the burden of proving. Defendants move for partial summary judgment on the issue of causation asserting only that Plaintiff has not proffered any evidence showing that Hays' diabetes and potentially low blood sugar level caused the accident.  Defendants alternatively could be arguing that no reasonable jury could conclude from the information presented by Plaintiff that the accident was caused by Hays' diabetes.  The court disagrees with both assertions.[1]

Plaintiff took the deposition of Dr. Chip Dale Holbrook, a family practice physician who examined Hays one month prior to the accident.  Dr. Holbrook testified extensively about his examinations of Hays on numerous occasions, including the October 10, 2007 visit.   Dr. Holbrook specifically stated that he refused to sign a Department of Transportation medical physical form for Hays on that date, and that he told Hays he was not clearing him for driving.  Dr. Holbrook stated that he refused to sign the form for Hays because of Hays' high blood sugar and the fact that Hays' urine test showed levels of glucose, a further indication that Hays' blood sugars were not being adequately processed by his body.  Dr. Holbrook also testified that he would not recommend that a person with Hays' diabetes go without eating for 9 hours, as Hays undisputably did on the date of the

---

[1]The court notes that no party has yet filed any *Daubert* motions on the numerous experts who have provided deposition testimony in this case and thus the court simply views the evidence in the light most favorable to Plaintiff as the non-moving party.

accident. Dr. Holbrook testified that this behavior *could* lead to symptoms such as fatigue and blurred vision.

Defendants are correct that Dr. Holbrook did not testify that high blood sugar would lead to these symptoms in all occasions. However, Plaintiff's medical endocrinologist expert, Dr. Samuel Freedman testified that an individual taking Glucovance, a medication Dr. Holbrook prescribed for Hays, on an empty stomach, as Hays indisputably did, would run a "high risk" of developing hypoglycemia, particularly three to four hours after the medication was taken. *See* Freedman Depo., at 157 (noting that accident here occurred four hours after Hays took medication). Dr. Freedman testified that "to a reasonable degree of medical probability and more likely than not," that Hays' diabetes was a contributing factor in causing the collision. *See* Freedman Depo., at 195; *see also* Freedman Expert Report ("It is my opinion that within a reasonable degree of medical probability, and more likely than not, Floyd Dexter Hays' diabetes contributed to his fatigue, somnolence, his lack of attention and vision problems, which led to his inability to responsibly operate his tractor trailer and directly led to the motor vehicle accident which occurred on November 11, 2007."). Furthermore, Hays stated that he did not know what he had hit on the road and the jury could infer that Hays' inattention was the result of his diabetes.

Defendants point to the fact that 70 minutes after the accident Hays' blood sugar level was 225. *See* Owenby Depo., at 58. Further, Hays' pulse and respiratory rates were normal,

as was his blood pressure. He also received the highest score on the Glasgow Coma Scale and was given high scores on his eye, motor, and verbal skills. *Id.* at 76-81. Defendants also note that Plaintiff's expert admitted that even if an individual suffers from high or low blood sugar, he will not always experience symptoms from that condition. *See* Freedman Depo., at 94, 142-43. Defendants further state that Hays testified in his deposition that he was not aware of the fact that Dr. Holbrook did not complete his Department of Transportation medical clearance and that his prior authorization did not expire until January 2008.

The court finds, however, that viewing the evidence in the light most favorable to Plaintiff as the non-moving party, a jury would be entitled to conclude that Hays' diabetes affected his driving based on the testimony of Dr. Holbrook who refused to sign off on Plaintiff's Department of Transportation medical form because he was concerned about Plaintiff's ability to drive with his symptoms of diabetes not under control and Dr. Freedman's opinion that Hays' diabetes led to fatigue, lack of attention, and vision problems which in turn led to the accident. For these reasons, the court DENIES Defendants' motion for summary judgment on causation.

### G.    Direct Action

Brookwood argues that Plaintiff may not pursue a direct action against it because there is no insurance policy for the Hobbs tractor trailer on file with the Georgia State

AO 72A
(Rev.8/82)

Revenue Commissioner. Brookwood further asserts that the tractor trailer insured by Brookwood is not a "motor common carrier" under Georgia statute because it was used to haul unmanufactured forest product. Plaintiff responds that the Georgia statute specifically permits the filing of a direct action even when the insured has failed to file its insurance policy with the State Revenue Commissioner when it was required to do so. Finally, Plaintiff avers that the tractor trailer is not exempt from definition as a "motor common carrier" because the stumps did not remain in the title of the producer, Hercules is not a "mill," and Hays was carrying the stumps in interstate commerce.

The general rule in Georgia is that a liability insurer may not be joined directly as a party defendant in an action for damages against its insured. *See Dundee Mills, Inc. v. John Deere Ins. Co.*, 248 Ga. App. 39 (2001). However, statutory exceptions exist for cases that involve certain motor carriers. *See* O.C.G.A. § 46-7-12(c) and § 46-7-12.1(c) (the "direct action statute").

Brookwood argues that the direct action statute does not apply here because there is no insurance policy for the trailer on file with the Georgia State Revenue Commissioner. However, the 2000 amendments to the direct action statute have made clear that the filing of a certificate of insurance is no longer a pre-requisite to a direct action suit. *See Jackson v. Sluder*, 256 Ga. App. 812 (2002) ("To remedy the anomalous statutory scheme, the legislature amended the direct action statute to dispense with the mandatory precondition

to suit that the carrier's insurance policy or certificate of insurance be on file with the [Public Service Commission]. The 2000 amendment expressly provides: 'The failure to file any form required by the commission shall not diminish the rights of any person to pursue an action directly against a motor carrier's insurer.'").[2]

---

[2]The version of O.C.G.A. § 46-7-12.1 in place at the time of the accident read:

(a) No motor common carrier or motor contract carrier shall be issued a permit unless there is filed with the state revenue commissioner a certificate of insurance for such applicant or holder on forms prescribed by the commissioner evidencing a policy of indemnity insurance by an insurance company licensed to do business in this state, which policy must provide for the protection of passengers in the case of passenger vehicles and for protection of the public against injury proximately caused by the negligence of such motor common or motor contract carrier, its servants, or its agents. The state revenue commissioner shall determine and fix the amounts of such indemnity insurance and shall prescribe the provisions and limitations thereof. The insurer shall file such certificate. The failure to file any form required by the state revenue commissioner shall not diminish the rights of any person to pursue an action directly against a motor common or motor contract carrier's insurer.

(b) The state revenue commissioner shall have power to permit self-insurance, in lieu of a policy of indemnity insurance, whenever in his or her opinion the financial ability of the motor common or motor contract carrier so warrants.

(c) It shall be permissible under this article for any person having a cause of action arising under this article to join in the same action the motor common or motor contract carrier and the insurance carrier, whether arising in tort or contract.

*Id.* (2005).

34

Defendants argue additionally, however, that the tractor trailer insured by Brookwood does not fit within the definition of "motor common carrier" and therefore, is not subject to the direct action statute. *See National Indemn. Co. v. Tatum*, 193 Ga. App. 698, 700 (1989). Plaintiff responds that Hays was transporting the forest products *interstate* and not *intrastate* and, therefore, he is not entitled to any exemptions from the Georgia definition of "motor common carrier."

The General Provisions of Title 46 to the Official Code of Georgia (Public Utilities and Public Transportation) do state that:

> Unless otherwise provided by Georgia law and not preempted by federal law or unless provided or allowed by federal law, the provisions of this title relating to carriers engaged in the transportation of passengers or goods within this state shall not apply to carriers engaged in interstate commerce.

O.C.G.A. § 46-1-4. A literal reading of this statute might lead one to the conclusion that the "direct action" statute would not apply at all to vehicles engaged in interstate commerce. The court, however, has located no case which so holds. Further, the "direct action" statute is a specific creation of a cause of action under Georgia law and nothing in § 46-1-4 would appear to prevent Georgia from creating this cause of action.

O.C.G.A. § 46-1-1(9)(C)(x) does provide an exemption from the definition of "motor common carrier" for:

> (x) **Motor vehicles engaged exclusively in the transportation of agricultural or dairy products, or both, between farm, market, gin, warehouse, or mill**, whether such motor vehicle is owned by the owner or

35

producer of such agricultural or dairy products or not, so long as the title remains in the producer. For the purposes of this division, the term "producer" includes a landlord where the relations of landlord and tenant or landlord and cropper are involved. As used in this division, the term **"agricultural products" includes** fruit, livestock, meats, fertilizer, wood, lumber, cotton, and naval stores; household goods and supplies transported to farms for farm purposes; or other usual farm and dairy supplies, including products of grove or orchard; poultry and eggs; fish and oysters; and **timber or logs being hauled by the owner thereof or the owner's agents or employees between forest and mill or primary place of manufacture**; provided, however, motor vehicles with a manufacturer's gross weight rated capacity of 44,000 pounds or more engaged solely in the transportation of unmanufactured forest products shall be subject to the Georgia Forest Products Trucking Rules which shall be adopted and promulgated by the commissioner of public safety only for application to such vehicles and vehicles defined in subparagraph (A) of paragraph (13) of this Code section . . .

*Id.* (emphasis added). *See also Jarrard v. Clarendon Nat. Ins. Co.*, 267 Ga. App. 594, 594 (2004) (under "certain circumstances when a vehicle is engaged exclusively in the transportation of certain agricultural or dairy products, it is not considered a motor carrier and the insurer may not be sued directly") (citing O.C.G.A. § 46-1-1(9)(C)(x)); *Smith v. Southern General Ins. Co.*, 222 Ga. App. 582, 583 (1996) (noting Georgia General Assembly has repeatedly exempted "forest products and logs being transported from the forest to the mill from the jurisdiction of the [Public Service Commission] and its regulation" and because of this "timber haulers were removed from the effect of O.C.G.A. § 46-7-12.").

AO 72A
(Rev.8/82)

While there is no dispute that Hays hauled only unmanufactured forest products, Plaintiff argues that Defendants do not fit within the timber exemption because (1) the Hercules plant is not a "mill" but a chemical extrusion plant, and (2) title to the forest product did not remain with the producer and instead passed to Hercules prior to shipping. The burden of proof of establishing an exemption is on the motor carrier and its insurer. *See Georgia Cas. & Sur. Co. v. Jernigan*, 166 Ga. App. 872, 874 (1983).

O.C.G.A. § 46-1-1(9)(C)(x) does not define "mill" and Plaintiff provides no case law or other support for his argument that the Hercules plant cannot qualify as a "mill" because it extrudes rosin out of the tree stumps and processes the rosin in to chemical compounds. "Mill" is defined as "a building or collection of buildings with machinery by which the processes of manufacturing are carried on." Webster's Third International Dictionary, 1434 (1981). Like a mill which takes wood and processes it into paper products, Hercules extracts rosin from tree stumps and processes the rosin. Under these circumstances, the court has no basis for holding that the Hercules plant does not qualify as a "mill."

Plaintiff's support for his assertion that title of the tree stumps had already passed to Hercules by the time the stumps were loaded on the tractor-trailer is a citation to the testimony of a Hercules forester that Hercules would negotiate contracts with landowners that permitted the extraction of stumps and testimony from a different Hercules forester that Hercules would lease land from landowners for the purpose of harvesting stumps. Neither

37

of these citations, however, addresses title to the stumps or when title to the stumps passed to Hercules who was not the "producer" of the stumps. The truck ticket for the load involved in the accident shows that it came from the land of Kent Sherrill in Escambia. *See* Grozier Depo., Exh. C. Hercules did not pay for the stumpwood until it was weighed at the Hercules plant in Brunswick. Hays and Sherrill were not paid any amount for the stumps until the stumps reached Brunswick. Without further information or argument, the court cannot conclude that the stumps did not remain in the title of the producer through their carriage to Brunswick.[3]

---

[3]Finally, the fact that trucks carrying over 40,000 pounds of forest products are subject to the Georgia Forest Products Trucking Rules does not affect whether those trucks are or are not exempt from classification as "motor carriers." The rules themselves state they are related to safety and not to liability.

> The Georgia Forest Products Trucking Rules are the minimum safety and operational rules promulgated by the Department for certain commercial motor vehicle operations engaged in the transportation of unmanufactured forest products. Prior to July 1, 1991, certain vehicles transporting these commodities were not subject to the safety jurisdiction of State Agencies. From 1991 – 2001, these rules were under the jurisdiction of the Georgia Public Service Commission; from 2001 – 2005, these rules were under the jurisdiction of the Georgia Department of Motor Vehicle Safety. After July 1, 2005 these rules are under the jurisdiction of the Georgia Department of Public Safety.

*Id.* at Chapter 4-1 Background. Such safety rules would not impact whether an interstate carrier is subject to O.C.G.A. § 46-7-12.

The court finds, therefore, that although direct action is not barred by the failure to file insurance forms with the relevant regulatory authority (the state agency responsible for such regulation has shifted repeatedly in the past several years), the tractor trailer involved in this accident is not a "motor carrier" under O.C.G.A. § 46-1-1(9)(C)(x). Because it is not a "motor carrier," direct action under O.C.G.A. § 46-7-12 is not authorized under the law.[4]

For the foregoing reasons, the court finds that Plaintiff may not pursue a direct action against the tractor trailer's insurer and GRANTS Brookwood Insurance Company's motion for summary judgment [126].

## III.    Conclusion

The court GRANTS IN PART AND DENIES IN PART Hercules Incorporated's motion for summary judgment [124]; GRANTS IN PART AND DENIES IN PART Floyd Dexter Hays and Dexter Hays Forest Products' motion for summary judgment [125]; and GRANTS Brookwood Insurance Company's motion for summary judgment [126].

The remaining parties are DIRECTED to submit a pre-trial order to the court within thirty (30) days of the date of this order.

---

[4]Plaintiff complains that if the direct action statute does not apply, it is a violation of equal protection under the United States and Georgia Constitutions. The court disagrees. Plaintiff has not shown how he is being treated differently from those similarly situated to him. Plaintiff does assert that if the accident had been caused by a non-exempt vehicle, he could have filed a direct action against the insurer, but he has not asserted that the Georgia legislature has made this distinction on an impermissible basis. *See Federal Communications Commission v. Beach Communications, Inc.*, 508 U.S. 307 (1993); *Panama City Medical Diagnostic Ltd. v. Williams*, 13 F.3d 1541 (11th Cir. 1994).

The Clerk of the Court is DIRECTED to DISMISS Brookwood Insurance Company.

**IT IS SO ORDERED** this 22nd day of March 2010.


       /s  J. Owen Forrester
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE